**Vernie Mae BOWLES, Appellant,**

v.

**Garland C. PENNY et al., Appellees**

**No. 15153.**

Court of Civil Appeals of Texas.

Dallas.

Oct. 12, 1956.

Rehearing Denied Nov. 16, 1956.

Richard F. Loomis, Jr., Dallas, for appellant.

Strasburger, Price, Kelton, Miller & Martin, Hobert Price, Dallas, for appellees.

CRAMER, Justice.

Appellant, a widow and mother of Raymond Bowles and Earl Bowles, both deceased, filed this suit against Garland C. Penny and Walter T. Bowles for damages growing out of the death of her two deceased sons, received from a head-on collision on Highway 80 near Grand Saline, between an automobile driven by Garland C. Penny, and a motorcycle on which her two sons were riding. Mrs. Bowles alleged certain acts of Garland C. Penny to be negligence which proximately caused the accident and injury to her sons which resulted in their death, and prayed for damages, etc. Appellee Penny defended by alleging certain acts of contributory negligence to be the proximate cause of the death of her two sons. The jury, in answer to special issues, found no negligence on part of Penny which was the proximate cause of the death of Mrs. Bowles' two sons; and found in answer to the issue on contributory negligence of Mrs. Bowles' son who was operating the motorcycle, that (10) "The failure of the operator of the motorcycle to turn to his right off the Highway onto the shoulder was negligence"; which was (10a) "a proximate cause of the collision in question"; and it found no negligence, or that the negligence found was not a proximate cause of the collision in question on the part of Penny.

The jury also found $10,000 would reasonably compensate the father and mother of their deceased sons for the actual pecuniary loss as a direct and proximate result of the death of their son Raymond; and found "none" in answer to the issue based on the death of their son Earl.

From the judgment on such verdict denying Mrs. Bowles a recovery, she has duly perfected this appeal, here briefing one point of error: "The error of the court in refusing to grant appellant a new trial because of the misconduct of the jury in discussing the effect of their answers to the special issues which took place during their deliberations and prior to the time that the jury had arrived at their verdict on each of the special issues, it being affirmatively shown by the testimony of some of the jurors that such discussion of the effect of their verdict was calculated to and did influence the answers of the jury to the special issues." Countered by appellee, that "the testimony offered by appellant at the hearing on the motion for a new trial wholly fails to show any jury misconduct, and that if it be conceded that there was any suggestion of misconduct, the testimony thereon was conflicting, and there was ample testimony to support the trial court's findings that the supposed misconduct did not occur."

The point and counterpoint only necessitate our examination of the evidence given on motion for new trial as to jury misconduct, using the test set out in Rule 327, Texas Rules of Civil Procedure.

Juror Connor, material here, testified in substance that to the best of his recollection he thought Juror Ford was the one who stated that it did not make any difference how the issues were answered, that they had awarded a sum of money to Mrs. Bowles and the rest of the issues didn't make any difference, that she would get the money; his recollection was that it did not come up but one time; it was in the presence of all the jurors; that after they discussed the evidence they sent the trial judge a note as follows: "If we find that the defendant Garland Penny is not negligence, will Mrs. Bowles be entitled to any damage?" Connor did not remember the exact wording, but it was about "whether she would or whether she wouldn't, and it was my opinion she would"; that two other jurors stated they also thought she would. recover. On cross-examination he testified in substance that what he meant was that he thought the lady ought to recover something, and that the other "jorors figured the other way"; that the jury could not agree as to the effect of their answers and he did not know the effect of his answers; he "thought she would get the judgment"; he would not say the jury was in total disagreement; the issues were not answered in numerical order; he relied on the statements he "heard in the jury room that it didn't make any difference how they were answered, that she was going to get the money anyhow * * *"; that he would not "have answered had he known she wouldn't get the money"; that he relied on such statements and would not so have answered the issues had he known she wouldn't get the money; "there wasn't any definite agreement in the jury room as to the effect of any answer, there was—Q. In other words, you didn't get together and agree what the effect of your answers would be in the jury room? A. Not near all of them, no." "Q. You did agree on some of them and some of them you didn't agree to the effect of your answer? A. That is right." That after reading issues 1, 1a, and 1b, he answered "It did" to the question as to whether the discussion he testified about "took place prior to the time the jury agreed to their answers." On re-cross he testified that there was some general discussion as to the effect of the answers, that they "all couldn't agree as to the various effects of these answers; there was a lot of disagreement during all the discussion as to what the effect of the answers would be." He stated he did not know what the effect of the answers would be and "They knew that I did not know the exact de-

termination—in other words, whether she would or whether she wouldn't, but I thought she would get the judgment.".

Jury Foreman McKinnon, in substance, material here, testified:

"Q. I will ask you whether or not in the deliberations of the jury, whether any one made the statement in your presence that it didn't make any difference how the issues were answered, that the plaintiff, Mrs. Bowles, would recover, irrespective—that is it didn't make any difference how you answered the issue? A. I don't recall that, sir.

"Q. I ask you whether or not you know Mr. Ford that was on that jury? A. Yes, sir. * * *

"Q. I will ask you whether or not if you had known that she wouldn't get the money, would you have answered the questions that way? I say, if you had known that she would not have gotten the money, then you would not have answered the issues in that way, is that correct, the way you answered them? A. That is right. * *

"Q. Just tell the court what the nature of the discussion was in regard to answering these issues? A. We discussed the answering of them and tried to answer them in a way whereby she would recover ten thousand dollars.

"Q. State whether or not you had an agreement to that effect before you started answering the issues? A. No sir, not before.

"Q. When did you have the agreement—what point in the deliberation—did you make the agreement at the beginning or in the middle, or when in your deliberation did you make that agreement? A. I would say some half of these answers had been made, and it looked like we couldn't come to any agreement, and we come to an agreement and went down the line and tried to answer them whereby she would recover ten thousand dollars.

"Q. About what point in your deliberation did this agreement come up? A. It was near the last."

That in answering the issues they just skipped around; they voted on each issue separately. On cross-examination, that he heard the court's instruction to answer the questions according to the evidence and that is the way he answered them, voted on each one, after discussion; there was a lot of giving and taking in reaching the verdict; he followed the court's charge to the best of his ability. And on re-direct, that his answer to issue No. 2 was from the evidence; he relied on Mr. Penny's testimony that he was doing 50 miles per hour, and answered accordingly.

Juror Daniels testified, material here, that:

"Q. I will ask you whether or not there was anybody in your presence or within your hearing, that made the statement, if such statement was made, that it didn't make any difference how you answered these issues, that Mrs. Bowles would get ten thousand dollars? A. Not that I recall, I don't think there was, no sir. * *

"Q. Was there any discussion in the jury room by anybody that it didn't make any difference how these issues were answered, Mrs. Bowles would get ten thousand dollars irrespective of how the issues were answered? A. I don't believe they did."

. That he did not recall that any one in his presence or in his hearing made the statement that it didn't make any difference how they answered the issues, that Mrs. Bowles would get $10,000; he did not believe there was such a discussion in the jury room.

Juror Pearson in substance testified that he did not recall any discussion in the jury room as to whether or not answering issue No. 1 would keep Mrs. Bowles from recovering $10,000; he believed the opinion of all the jurors was that she would; there

was a discussion in the jury room that they were to give Mrs. Bowles the $10,000 without finding that Mr. Penny was the sole cause of the accident; and as follows:

"Q. In substance, what was that discussion, the best you can remember? A. Just like I just stated—we didn't find that Mr. Penny was the sole cause of the accident, but we did find that it wouldn't conflict with giving her ten thousand dollars.

"Q. Was that discussion had before you reached your final answer to those questions? A. Yes, sir, to the best of my recollection it was. * * *

"Q. Then you were trying all along in your answer to each one of these questions, to base your answer on the evidence that you had heard in this court room—that was what you were trying to do, was it not? A. Yes, sir, what we was supposed to do.

"Q. And so far as you know that was what all the other jurors would do, or were trying to do? A. Yes. * * * I think it was the opinion of all of them that she would get it, but of course you know I am just one. * * *

"Q. You think it was their opinion? A. Their intention, but of course I am not answering for them.

"Q. But you still feel that you did answer the question based on the evidence in the case, as you saw it? A. I do * *

"Q. You still think you answered the question, each question under the evidence as you saw it? A. If we wasn't misled on it.

"Q. Do you know any question that you were misled on? A. If we understood them right, maybe I had better put it that way.

"Q. What I mean is, I am not speaking about the legal effect, but the questions, what the court was asking you, you were not confused about that, were you? A. There was one question that I was, where this 'proximate cause'—when we did not

find him the sole cause—that was a little confusing there."

Under the above record, the testimony is conflicting on the material questions raised in the motion. Under such circumstances the judge's implied findings in support of his order overruling appellant's motion for new trial based on jury misconduct, are binding on us. Trousdale v. Texas & N. O. R. Co., 154 Tex. 231, 276 S.W.2d 242; also 9 Southwestern Law Journal 484, "New Trial—Jury Misconduct—Probable Injury;" and Vol. 2. South Texas Law Journal 85.

Point 1 is overruled and the judgment of the trial court is

Affirmed.